**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

**Plaintiff,**

             **v.**                      **Criminal No.** 16-547 (FAB)

LUIS CARMONA-BERNACET, a/k/a
"CANITO CUMBRE" [1], *et al.*,

**Defendants.**

## OPINION AND ORDER

BESOSA, District Judge.

Ten pretrial motions are before the Court.  First, defendant Luis Carmona-Bernacet ("Carmona")'s moves to dismiss the fourth-superseding indictment.  (Docket No. 743.)  He also requests a Bill of Particulars and disclosure of the grand jury instructions. Id.  Second, defendants Alan Lugo-Montalvo ("Lugo"), Fabiany Alméstica-Monge ("Alméstica"), and Rolando Rivera-Solís ("Rivera") request that the Court compel the United States to disclose the identity of an alleged government informant.  (Docket Nos. 519 and 539.)  Third, Alméstica, Lugo, and Rivera move for severance pursuant to Federal Rule of Criminal Procedure 14. (Docket Nos. 522, 523 and 547.)  Fourth, Alméstica, Lugo, Rivera, and defendant Yadier Serrano-Canales ("Serrano") move to exclude uncharged murder evidence.  (Docket Nos. 624 and 750.)  Fifth, Lugo moves to exclude cellular phone evidence.  (Docket No. 623.)

Sixth, Lugo moves to exclude evidence of lawful employment. (Docket No. 621.)  Seventh, Alméstica, Lugo, Rivera, and defendant Alex Burgos-Amaro ("Burgos") move to exclude evidence of religious affiliation.  (Docket Nos. 548, 620 and 622.)  Eighth, Alméstica and Rivera move to exclude evidence of a 2009 intervention pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"). (Docket No. 553.)  Ninth, Alméstica and Burgos move to exclude evidence of a 2007 intervention pursuant to Rule 404(b).  (Docket No. 619.)  Tenth, Alméstica moves to exclude evidence of a prior conviction.  (Docket No. 618.)

For the reasons set forth below, Carmona's motion to dismiss is **DENIED**.  (Docket No. 743.)  Alméstica, Lugo, and Rivera's motions to disclose the identity of an alleged government informant are **DENIED.**  (Docket Nos. 519 and 539.)  Alméstica, Lugo, Rivera, and Serrano's motions to sever and exclude uncharged murder evidence are **HELD IN ABEYANCE.**  (Docket Nos. 522, 523, 547, 624 and 750.)  Lugo's motion to exclude cellular phone evidence is also **HELD IN ABEYANCE.**  (Docket No. 623.)  Lugo's motion to exclude evidence of lawful employment is **DENIED WITHOUT PREJUDICE.** (Docket No. 621.)  Alméstica, Lugo, Rivera, and Burgos' motion to exclude evidence of religious affiliation are **DENIED.**  (Docket Nos. 548, 620 and 622.)  Alméstica and Rivera's motion to exclude evidence of the 2009 intervention is **DENIED.**  (Docket No. 553.)

Alméstica and Burgos' motion to exclude evidence of the 2007 intervention is **DENIED**.  (Docket No. 619.)  Lastly, Alméstica's motion to exclude evidence of a prior conviction is **DENIED**. (Docket No. 618.)

## I.   Background

The allegations underlying this criminal action occurred between 2000 and 2014.  (Docket No. 673.)  During this timeframe, the defendants purportedly possessed and used firearms in furtherance of a drug-trafficking conspiracy.  Id.  Carmona, Serrano, Rivera, and Burgos are also charged with murder.  Id. The drug-trafficking conspiracy count is foundational, serving as an anchor for the subsequent firearm and murder allegations.

### A.   The Drug Trafficking Conspiracy and Firearm Possession Allegations (Counts One and Two)[1]

Carmona, Serrano, Lugo, Alméstica, Rivera, and Burgos allegedly entered into a drug-trafficking conspiracy.  (Docket No. 673 at p. 2.)  The drug-trafficking organization ("DTO") sold crack, cocaine, and marihuana at drug distribution points in San Juan, Trujillo Alto, Guaynabo, and Bayamón.  Id. at p. 3.

---

[1] The facts set forth in this Opinion and Order are based on the allegations contained in the fourth-superseding indictment.  (Docket No. 673.)  The Court is mindful that, at this juncture, these are mere allegations, and that the defendants are presumed to be innocent unless and until the United States proves otherwise beyond a reasonable doubt.

Members of this conspiracy assumed distinct roles and responsibilities.  For instance, leaders "[had] final authority regarding all issues concerning the operation."  Id. at p. 4. Violence, force, and intimidation ensured that enforcers, managers, and runners respected the DTO hierarchy.  Id.

Two allegations differentiate this DTO from the norm. First, co-conspirators "employ[ed] other members of the conspiracy in their maintenance and service-related companies."  Id. at p. 4.  Essentially, the defendants operated a cleaning-company as "part . . . of the conspiracy."  Id.  Second, DTO leaders practiced "the 'Santeria' religion to protect drug-trafficking activities." Id. at pp. 4—5.  These leaders provided advice and "religious guidance" to co-conspirators.  Id. at p. 5.  They also supplied their religious followers with firearms, ammunition, and vehicles. Id.

On June 29, 2021, a grand jury returned a fourth-superseding indictment, charging Carmona, Serrano, Lugo, Alméstica, and Burgos with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. sections 846, 860 (count one), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. section 924(c)(1)(A) (count two).  (Docket No. 673.)

B.    **The Murder of William Castro-Vidot (Count Three)**

The defendants allegedly formed an enterprise[2] that engaged in racketeering activity, "consisting of" a drug-trafficking offense.  Id. at p. 7.[3]  Despite specific reference to Serrano, Lugo, Alémstica, Rivera, and Burgos as members of the enterprise, only Carmona is charged with aiding and abetting the murder of William Castro-Vidot.  Id. at p. 6.  Carmona allegedly committed this murder "during and in relation to a crime of violence for which he may be prosecuted in a Court of the United States, that is, a violent crime in aid of racketeering activity in violation of Title 18, United States Code, Section 1959(a)(1)." Id. at p. 8.[4]

C.    **The Murder of René Cruz-Cuadrado (Count Four)**

Counts three and four are nearly identical.  Both allege that the defendants formed an enterprise.  (Docket No. 673 at

---

[2] In the context of this criminal action, an enterprise is: "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).

[3] "Racketeering activity" is "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . which is chargeable under State law and punishable by imprisonment for more than one year," or "any act which is indictable under" enumerated sections of the United States Code.  18 U.S.C. § 1961(1).

[4] The predicate "violent crime" in counts three, four, and five is 18 U.S.C. § 924(j)(1).

pp. 6—9.)   Count four avers, however, that the racketeering

activity consisted of:

> murder, chargeable under Articles 26 (attempt), 82
> (general murder statute), 83 (first degree and second
> degree murder), and 262 (conspiracy) of the 1974 Puerto
> Rico Penal Code, and Article 35 (attempt), 105 (general
> murder statute), 106 (first degree and second degree
> murder), and 249 (conspiracy) of the 2004 Puerto Rico
> Penal Code, and offenses involving trafficking in
> controlled substances in violation of Title 21, United
> States Code, Sections 841 and 846.

(Docket No. 673 at p. 9.)   Only Carmona is charged with aiding

and abetting the murder of René Cruz-Cuadrado.   Id. at p. 10.

### D.   The Murder of Maurice Spagnoletti (Count Five)

The substantive allegations in counts four and five are

the same.   Count five charges Carmona, Serrano, Rivera, and Burgos

with the murder of Maurice Spagnoletti.   Id. at p. 12.   The

following chart sets forth the offenses charged in the fourth-

superseding indictment.

**Continue to Next Page**

| Count | Offense | Defendant(s) |
|-------|---------|--------------|
| 1 | Conspiracy to Possess with Intent to Distribute Controlled Substances, 21 U.S.C. §§ 846, 869 | Carmona, Serrano, Lugo, Alméstica, Rivera, and Burgos |
| 2 | Possessing a Firearm in Furtherance of a Drug-Trafficking Crime, 18 U.S.C. § 924(c)(1)(A) | Carmona, Serrano, Lugo, Alméstica, Rivera, and Burgos |
| 3 | Use of a Firearm During and in Relation to a Crime of Violence Resulting in the Murder of William Castro-Vidot, 18 U.S.C. § 924(j)(1) | Carmona |
| 4 | Use of a Firearm During and in Relation to a Crime of Violence Resulting in the Murder of René Cruz-Cuadrado, 18 U.S.C. § 924(j)(1) | Carmona |
| 5 | Use of a Firearm During and in Relation to a Crime of Violence Resulting in the Murder of Maurice Spagnoletti, 18 U.S.C. § 924(j)(1) | Carmona, Serrano, Rivera and Burgos |

## II.  Carmona's Motion to Dismiss

Carmona moves to dismiss every count of the fourth-superseding indictment. (Docket No. 643.)  This motion is nothing more than a fishing expedition, fraught with disregard for well-established precedent.

### A.  Legal Standard

The right to an indictment is rooted in the Bill of Rights and appurtenant legislation.  Pursuant to the Fifth Amendment, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Cont. amend. V.  The Sixth Amendment also

prescribes that the accused shall have the right "to be informed
of the nature and cause of the accusation."  U.S. Cont. amend.
VI. Congress subsequently clarified that the indictment "must be
a plain, concise, and definite written statement of the essential
facts constituting the offense charged."  Fed. R. Crim. P.
7(c)(1).  A defendant may request dismissal for *inter alia* a "lack
of specificity" or "failure to state an offense."  Fed. R. Crim.
P. 12(b)(3).

The authority to indict rests exclusively with the grand
jury, a "constitutional fixture in its own right."  United States
v. Williams, 504 U.S. 36, 47 (1992).  This body conducts an
independent, secret investigation to determine whether there is
probable cause to indict.  In re United States, 441 F.3d 44, 57
(1st Cir. 2006) ("[The] whole theory of its function is that [the
grand jury] belongs to no branch of the institutional Government.
Thus, it remains functionally and conditionally at arms-length
from the judicial branch.") (internal citation and quotation marks
omitted).  By serving as an intermediary between the public and
government officials, the grand jury prevents the commencement of
"wrongful prosecution[s] by an overbearing state."  United States
v. Mills, 995 F.2d 480, 486 (4th Cir. 1993); see Rodger A. Fairfax,
Jr., Grand Jury Discretion and Constitutional Design, 93 CORNELL L.
REV. 703, 731 (2008) ("For those of the founding generation

concerned about the potential aggrandizement of central governmental authority, the grand jury, much like the petit jury, represented a significant check on the federal criminal prosecution power.").

An indictment is sufficient "if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he [or she] must defend, and enables him [or her] to enter a plea without fear of double jeopardy." United States v. Ford, 839 F.3d 94, 104 (1st Cir. 2016) (internal quotation marks and citation omitted). "[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002) (internal quotation marks and citation omitted); see also United States v. Rodríguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019) ("unlike a civil complaint that need allege facts that plausibly narrate a claim for relief, a criminal indictment need only apprise the defendant of the charged offense.") (internal quotation marks and citation omitted).

In considering the merits of a motion to dismiss an indictment, courts "must take the allegations in the indictment as true," cognizant that "the question is not whether the

government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted). Notably, the indictment need not provide a preview of the evidence adduced at trial. See United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (noting that the "government need not recite all of its evidence in the indictment").

      1.   **Count One**

          According to Carmona, count one is defective. (Docket No. 743 at p. 9.) This allegation provides that:

> on a date unknown, but not later than the year 2000 and continuing up to the year 2014, in the District of Puerto Rico, and within the jurisdiction of this Court, [Carmona, Serrano, Lugo, Alméstica, Rivera, and Burgos] did knowingly and intentionally, combine, conspire, and agree with other persons known and unknown to the Grand Jury, to commit an offense against the United States, that is, to knowingly and intentionally possess with intent to distribute controlled substances, that being: **280 grams or more of a mixture or substance containing cocaine base (crack) . . . 5 kilograms or more of a mixture or substance containing cocaine . . . and a mixture or substance containing a detectable amount of marihuana** . . . within 1,000 feet of housing facilities owned by a public housing authority, and other areas within the municipalities of San Juan, Trujillo Alto, Guaynabo, and Bayamón.

(Docket No. 673 at p. 2) (emphasis added). Carmona contends that the grand jury must specify the drug quantity that each defendant agreed to possess as a member of the conspiracy. This statement

is patently incorrect. "In a drug-conspiracy case . . . each co-conspirator is responsible not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." United States v. Pinkham, 896 F.3d 133, 136 (1st Cir. 2018).

        To secure a conviction for count one, the United States must establish "[1] the existence of a conspiracy to possess [crack cocaine, cocaine, and marihuana] with intent to distribute it within 1,000 feet of a protected area [*i.e.*, a public housing facility], and [2] that the defendant knowingly and willfully joined in that conspiracy." United States v. Velázquez-Fontánez, 6 F.4th 205, 216 (1st Cir. 2021); see United States v. Ortiz, 447 F.3d 23, 32 (1st Cir. 2006) ("To prove a defendant guilty of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation."). Count one contains the essential elements of a section 846 offense: (1) the defendants participated in a drug-trafficking conspiracy from 2000 to 2014 in San Juan, Trujillo Alto, Guaynabo, and Bayamon; and (2) Carmona knowingly and intentionally joined this conspiracy.  The grand jury need not proffer additional

allegations.  Accordingly, count one provides sufficient notice
of the charged offense.

Carmona asserts, however, that "[d]rug quantity is
an essential element of any alleged violation of 21 U.S.C.
841(B)(1)(A) (*sic*)."  Id. at p. 9.  This statement is an
oversimplification of the law.  A person convicted of a drug-
trafficking conspiracy is "subject to the same penalties as those
prescribed for the offense, the commission of which was the object
of the attempt or conspiracy."  21 U.S.C. § 846.  The substantive
offense alleged in count one is a violation of 18 U.S.C. section
841 ("section 841").  (Docket No. 673 at pp. 1—2.)  This section
sets forth "a default penalty range . . . then higher ranges for
an aggravated offense when a certain triggering quantity of drugs
is involved."  United States v. Razo, 782 F.3d 31, 39 (1st Cir.
2015).  The mandatory minimum sentence for count one is a ten-
year term of imprisonment.  21 U.S.C. § 841(b)(1)(A).

In a section 846 prosecution, drug quantity is a
conditional element of the offense.  At trial, facts "such as drug
quantity are to be considered elements of the offense and must be
found beyond a reasonable doubt **if** those facts increase the
penalty for a crime beyond the prescribed mandatory maximum . . .
or increase the mandatory minimum sentence for a crime."  United
States v. Rivera-Ruperto, 852 F.3d 1, 11 (1st Cir. 2017) (quoting

_Apprendi v. New Jersey_, 530 U.S. 466, 490 (2000); _Alleyne v. United States_, 570 U.S. 99, 108 (2013)) (internal quotation marks omitted) (emphasis added).   By referring to specific drug quantities, count one places Carmona on notice that, if convicted – and if the jury finds him liable for the threshold drug quantity — he will serve no less than ten years in prison.   _See_ _United States v. Ortiz-Islas_, 829 F.3d 19, 27-28 (1st Cir. 2016) ("A statutory minimum must rest on a jury finding as well, . . . and we have previously held that it must be based on the drug quantity attributable to the defendant individually, rather than to the conspiracy collectively"); _United States v. Diggs_, Case No. 02-1129, 2003 U.S. Dist. LEXIS 10033, at * 5 (N.D. Ill. June 13, 2003) ("[By] alleging that the defendant conspired to distribute cocaine in excess of five kilograms and crack cocaine in excess of 50 grams, [count one] adequately demonstrates that the grand jury found probable cause to believe that the defendant conspired with regard to quantities sufficient to trigger the enhanced statutory penalty pursuant to § 841(b)."); _United States v. Aispuro-Medina_, Case No. 16-1136, 2016 U.S. Dist. LEXIS 146191, at *8 n.3 (D. Ariz. Oct. 4, 2016) ("The failure to allege a specific amount of marijuana involved in the conspiracy impacts the statutory maximum penalty for this offense (5 years), but not

the sufficiency of Count One which alleges a distributable amount
of marijuana.").

> The jury will determine the applicable drug
quantity by rendering "conspiracy-wide" and "individualized"
findings of fact. United States v. Pizarro, 772 F.3d 284, 293
(1st Cir. 2014); United States v. Ramos-González, 775 F.3d 483,
508 (1st Cir. 2015) ("The Supreme Court's decisions in Apprendi
and Alleyne establish that a jury must find beyond a reasonable
doubt any drug quantity that triggers a mandatory-minimum and
statutory-maximum sentence under 21 U.S.C. § 841, whose multiple
subsections set our different crimes.") (citation omitted).
Essentially, Carmona seeks a level of specificity that exceeds
the pleading standard set forth in Rule 7. As this Court stated
in denying a similar request by Alméstica and Lugo, indictments
"are not required to set forth every detail that the United States
intends to prove at trial."). See United States v. Carmona-
Bernacet, 539 F. Supp. 3d 235, 260 (D.P.R. 2021) (Besosa, J.).

### 2.   Count Two

> Carmona moves to dismiss count two for lack of
specificity. (Docket No. 743.) This count alleges that:

> > [b]egining on a date unknown, but not later than the
> > year 2000 and continuing up to the year 2014, in the
> > District of Puerto Rico, and within the jurisdiction
> > of this Court . . . the defendants, and other persons
> > known and unknown to the Grand Jury, did knowingly

      possess firearms, of unknown make and caliber, as that term is defined in Title 18, <u>United States Code</u>, Section 921(a)(3), in furtherance of a drug trafficking crime for which they may be prosecuted in a court of the United States, as charged in Count One of the instant indictment.  All in violation of 18, <u>United States Code</u>, Sections 924(c)(1)(A) and 2 ["section 924(c)"].

(Docket No. 673 at p. 6.)  To sustain a section 924(c)(1)(A) conviction, the United States must prove that Carmona "(1) committed a drug trafficking crime; (2) knowingly possessed a firearm; and (3) possessed the firearm in furtherance of a drug trafficking crime." <u>United States v. Peña</u>, 586 F.3d 105, 113 (1st Cir. 2009).

      Carmona's request to dismiss count two is unavailing.  Without citing precedent, he claims that this allegation fails to identify: (1) "which of the defendants used, or carried, or possessed firearms," (2) "the firearms alleged to have been used, carried, or possessed," and (3) the "dates on which firearms where used, carried, or possessed."  (Docket No. 743 at p. 18.)  These arguments disregard fundamental legal principles.

      First, count two states explicitly that Carmona, Serrano, Lugo, Roméstica, Rivera, and Burgos possessed a firearm in violation of section 924(c).  (Docket No. 673 at p. 6.) Accordingly, Carmona cannot feign confusion regarding "which of

the defendants" purportedly possessed a firearm in furtherance of
the drug-trafficking conspiracy. Because the defendants are
charged with a drug-trafficking conspiracy, the possession of a
firearm is subject to varying factual formulations. Pursuant to
the Pinkerton doctrine, a defendant is "liable for the substantive
crime of a coconspirator provided the crime was reasonably
foreseeable and committed in furtherance of the conspiracy."
United States v. Vázquez-Botet, 532 F.3d 37, 62 (1st Cir. 2008)
(citing Pinkerton v. United States, 328 U.S. 640, 647-48 (1946)).
Discovery and the evidence adduced at trial will reveal whether
Pinkerton is applicable, and how the defendants allegedly violated
section 924(c). The indictment need not, however, reveal the
United States' case-in-chief to satisfy Rule 7.

        Second, a section 924(c) allegation need not
identify the specific firearm used by the defendants. See United
States v. McIntosh, 23 F.3d 1454, 1457 (8th Cir. 1994) ("Because
the specific type of firearm is not an element of [a section
924(c) offense] which the government must prove, the references
to 'Arminius' and 'Western Star' model do not invalidate the
indictment."); United States v. Kuehne, 547 F.3d 667, 697 (6th
Cir. 2008) ("[Under] § 924(c), the specific type of firearm used
or possessed by a coconspirator is not an essential element of
that crime.") (citation omitted); United States v. Brown, 151 Fed.

Appx. 787, 793 (Sept. 21, 2005) ("In this case, the specifics regarding the type of firearm were mere surplusage because the specific type of firearm is not an element of a § 924(c)(1)(A) offense.").

　　　　Third, a section 924(c) count need not allege the specific date of the offense when the predicate charge is a drug-trafficking conspiracy. See United States v. Kinsella, 380 F. Supp. 2d 7, 11 (D. Me. 2005) ("[Although] Kinsella argues [that] the Government must disclose exact dates, times, and places when he participated in any overt act in furtherance of the conspiracy, the First Circuit has held that § 846 does not require the Government to plead or prove any overt act in furtherance of the conspiracy.") (quoting United States v. Pavia, 892 F.2d 148, 155 (1st Cir. 1989)); United States v. Hollock, 941 F.2d 36, 40-41 (1st Cir. 1991) ("A conspiracy may include several overt acts, but, as the government is not required to prove any of the acts constituting the conspiracy, the absence of a statement of the precise dates and locations of such acts does not necessarily render the indictment impermissibly vague."); United States v. Pirk, 267 F. Supp. 3d 406, 438 (W.D.N.Y. 2017) (noting that "courts routinely deny requests for further particularization of 924(c) counts, including specific dates and places of firearms

possession, that span a period of time.") (internal citation and
quotation omitted) (citing cases).

### 3.   Counts Three, Four, and Five

Carmona argues that counts three, four, and five
"extend beyond the limits of the [charged offense]."   (Docket
No. 743.)   These allegations claim that Carmona used a firearm
during and in relation to a crime of violence resulting in murder
in violation of the Violent Crimes in Aid of Racketeering Activity
statute, 18 U.S.C. 1959 ("VICAR").   (Docket No. 673 at pp. 6-10.)
Congress enacted this statute in 1984 "as the violent crime
corollary to the RICO statute."   United States v. Savage, 970 F.3d
217, 273 (3rd Cir. 2020) (quotation omitted).   The United States
must prove that:

> (1) an enterprise existed; (2) the enterprise affected
> interstate commerce; (3) the enterprise was engaged in
> racketeering activity; (4) the defendant was a member of
> the enterprise, (5) the defendant committed the alleged
> crime of violence, and (6) the defendant committed the
> crime ["for a promise or agreement to pay, anything of
> pecuniary value," or] in furtherance of his membership
> in the enterprise.

United States v. Brandao, 448 F. Supp. 2d 311, 327 (D. Mass. 2006)
(see 18 U.S.C. § 1959(a)).   The section 924(j) offense alleged
in counts three, four, and five are predicated on VICAR offenses.
(Docket No. 673 at pp. 7—12.)

Carmona moves to dismiss counts three, four, and five for two reasons.  First, he contends that the "general accomplice liability provisions of 18 U.S.C. § 2 alleged in the indictment do not apply to § 924(j) counts."  (Docket No. 473 at p. 19.)  Second, he asserts the "elements of the state law offenses underlying the VICAR charges" are absent from the fourth-superseding indictment.  Id. at p. 26.

### a.    Accomplice Liability

Carmona misconstrues the law of accomplice liability.  He maintains that "expanded accomplice liability under 18 U.S.C. § 2 ["section 2"] was specifically rejected by Congress when it enacted 18 U.S.C. 924(j)(1)."  (Docket No. 743 at p. 19.) Section 2 states that:

(a) Whoever commits an offense against the United States or aid, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18. U.S.C. § 2.  If Carmona were correct, a person could "knowingly [help] another" commit a 924(j) offense without fear of prosecution.  See Stepanets, 879 F.3d at 375 (noting that an aider and abettor is "one who associates himself with the [criminal] venture . . . participates in it as in something that he wishes to bring about, and seeks by his action to make it succeed.")

(internal citation and quotation omitted).  Carmona cites no case,
statute, or other legal authority for the proposition that
sections 2 and 924(j) are incompatible.  He notes that the phrase
"aids and abets" is absent from section 924(j), relying
exclusively on rules of statutory construction.[5]  But this phrase
is absent from most, if not all, criminal statutes.  <u>See, e.g.</u>,
18 U.S.C. § 922(g)(1), 1951(a), 2119(1).

          The First Circuit Court of Appeals has held
that "aiding and abetting is an alternative charge in every count,
whether explicit or implicit."  <u>United States v. Díaz-Rodríguez</u>,
853 F.3d 540, 546-47 (1st Cir. 2017) (quotation omitted); <u>United
States v. Marino</u>, 277 F.3d 11, 29 (1st Cir. 2002) ("Aiding and
abetting liability is inherent in every federal substantive
crime.") (citation omitted).  In fact, convictions based on
sections 2 and 924(j) have routinely been affirmed by the First
Circuit Court of Appeals.  <u>See, e.g.</u>, <u>United States v. Morales-</u>

---

[5] Section 924(j) provides that:

> A person who, in the course of a violation of subsection (c), causes
> the death of a person through the use of a firearm, shall –
>
> (1) if the killing is a murder (as defined in section 1111), be
>     punished by death or by imprisonment for any term of years or
>     for life; and
>
> (2) if the killing is manslaughter (as defined in section 1112),
>     be punished as provided in that section.

18 U.S.C. § 924(j).

<u>Machuca</u>, 546 F.3d 13, 22 (1st Cir. 2008) (affirming a section 924(j) conviction, noting that "the government had to demonstrate that [the defendant] **aided and abetted** the use of a firearm in committing a crime of violence.") (emphasis added); <u>United States v. García-Ortiz</u>, 904 F.3d 102, 109 (1st Cir. 2018) (affirming a conviction pursuant to sections 2 and 924(j)); <u>United States v. Medina-Villegas</u>, 700 F.3d 580 (1st Cir. 2012) (affirming count eight of the indictment, "[charging] the appellant with **aiding and abetting** the use and discharge of firearms during and in relation of a crime of violence resulting in death") (emphasis added); <u>United States v. Hansen</u>, 434 F.3d 92 (1st Cir. 2006) (affirming the conviction of a defendant who "used a firearm during a crime of violence and thereby caused murder, in violation of **18 U.S.C. §§ 2, 924(c), and 924(j)**") (emphasis added); <u>United States v. Ramírez-Rivera</u>, 800 F.3d 1, 14 n.4 (1st Cir., 2015) (affirming the conviction of "Count 30: use and carry of a firearm in relation to a crime of violence (*i.e.* Pequeque's murder), in violation of **18 U.S.C. §§ 924(c)(1)(A)[, 924(j), and 2]**") (emphasis added).

### b.    Racketeering Activity

Carmona argues that the fourth-superseding indictment "must set forth all of the essential elements of the charges, including the elements of the underlying substantive law

offenses that constitute the predicate 'racketing activity."
(Docket no. 743 at p. 28.)  This statement is wrong.

        The VICAR allegation in count three is based
solely on drug-trafficking acts committed in violation of 21
U.S.C. sections 841 and 846.  Id. at p. 7.  Counts four and five
also set forth a litany of Puerto Rico crimes, including first
and second-degree murder in violation of Article 83 of the 1974
Puerto Rico Penal Code.  Id. at p. 9.  Citation to these statutes
is sufficient because a VICAR allegation need not list the
elements of each racketeering activity.  See United States v.
Mills, 378 F. Supp. 3d 563, 576 (E.D. Mich. 2019) ("Although [the
defendant] demands that an indictment alleging a violation of
VICAR must also allege the elements required to prove the
underlying state-law predicate offense, this is not necessary.").

        Carmona cites United States v. Carrillo, 229
F.3d 177 (2d Cir. 2009), contending that failure to charge the
predicate offense with greater specificity is a fatal omission.
(Docket No. 743 at p. 39.)  Carrillo is inapposite.  The Second
Circuit Court of Appeals held that the "safer course [in a VICAR
prosecution] is for the trial judges to instruct the jury on the
elements of the predicate offenses."  229 F.3d at 185.  But, the
Carrillo Court reiterated "that the indictment need not *recite*
all elements of the state law offense constituting a racketeering

act." Id. at 183 (citing United States v. Orena, 32 F.3d 704, 714 (2d Cir. 1994) ("[Only] a generic definition of an underlying state crime is required in a RICO indictment, as distinguished from the elements of the penal codes of the various states where acts of racketeering occurred.") (quotation omitted)).  Because Carmona's arguments are meritless, his motion to dismiss the fourth-superseding indictment is **DENIED**.

   **B.    The Bill of Particulars**

        Carmona requests a Bill of Particulars because the fourth-superseding indictment fails to allege: (1) "specific subsections of the Puerto Rico criminal statues," (2) "the government's theory of his alleged criminal liability," (3) how "he allegedly satisfied the elements of the crimes," and (4) "any circumstances surrounding the alleged commission of the crimes, such as [his] role or *mens rea*." (Docket No. 743 at p. 34.)  He claims that the absence of this information "limits his ability to prepare a defense." Id.

        Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, the Court "may direct a filing of a bill of particulars." Fed. R. Crim. P. 7(f).  "A bill of particulars is a formal written statement by the prosecutor providing details of the charges against the defendant." 1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure: Criminal § 130,

at 656 (4th ed. 2008).  This statement serves to "protect against jeopardy, provide the accused with sufficient detail of the charges against him where necessary to the preparation of his defense and to avoid prejudicial surprise at trial."  United States v. Leach, 427 F.2d 1107, 1110 (1st Cir. 1970).  A bill of particulars is not, however, a discovery device or an investigative tool.  See United States v. Rodríguez-Torres, 560 F. Supp. 2d 108, 111 (D.P.R. 2008) (García-Gregory, J.) (citing United States v. Kilrain, 566 F.2d 979, 985 (5th Cir. 1978)).

Carmona's request for a bill of particulars is nothing more than an improper request for discovery.  Accordingly, this motion is **DENIED.**

**C.  The Motion to Disclose Grand Jury Instructions**

Carmona requests disclosure of the grand jury instructions "because the Indictment does not make clear, and it is nowhere else apparent, that the Grand jury made individual findings of probable cause as to each defendant on the quantity element of the charged offense."  (Docket No. 743 at p. 11.)  The "indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity."  United States v. Capozzi, 486 F.3d 711, 727 (1st Cir. 2007) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)).  Carmona shoulders the burden of demonstrating a "particularized

need" for the grand jury instructions.  Id.  He has failed to meet
this burden.  The grand jury need not render "individual" drug
quantity allegations for a section 846 charge.  Consequently,
Carmona's request for disclosure of the grand jury instructions
is **DENIED**.

> D.  **The _Roviaro_ Motion**

According to Lugo, Alméstica, and Rivera, "there is
[_sic_] at least one or more informants and witnesses for the
government."  (Docket No. 519 at p. 2; Docket No. 539.)  They
request that the United States identify these persons and provide
their contact information, allowing the defense to prepare for
trial.  Id.

The United States may "withhold from disclosure the
identity of persons who furnish information of violations of law
to officers charged with enforcement of that law."  _Roviaro v.
United States_, 353 U.S. 53, 59 (1957).  This privilege is "not
absolute."  _United States v. Cartagena_, 593 F.3d 104, 112-13 (1st
Cir. 2010).  "Where the disclosure of an informant's identity, or
of the contents of his communication, is relevant and helpful to
the defense of an accused, or is essential to a fair determination
of a cause, the privilege must give way."  _Roviaro_, 353 U.S. at
60-61. The "presumption in favor of confidentiality" is a "heavy"
burden for the defendant to overcome.  _United States v. Mills_,

710 F.3d 5, 14-15 (1st Cir. 2013).  The Court's inquiry is "case-specific," cognizant of the defendant's right to prepare for trial, the "informant's stake in confidentiality," and the "nature of the offense charged."  Id. at 14.

Lugo, Alméstica, and Rivera speculate that disclosure of the informant's identity, assuming there is an informant, will aid the defense.  Speculation is not, however, a sufficient reason to compel disclosure.  Id. at 14 ("Obviously, a defendant must spell out how an informer's testimony would help whatever defense theory he pins his hopes on."); see Cartagena, 593 F.3d at 114 ("Disclosure is only proper if Cartagena shows us 'concrete circumstances that might justify overriding both the public interest in encouraging the flow of information, and the informant's private interest in his or her own safety."); United States v. Tzannos, 460 F.3d 128, 141 (1st Cir. 2006) (affirming the denial of a Roviaro motion because the defendant "failed to show why disclosure of the identity of CI-1 is warranted in the circumstances of this case.").  Because Lugo, Alméstica, and Rivera have failed to overcome the presumption of confidentiality, their Roviaro motion is **DENIED.**

E.   **The Motion to Sever Trials**

Alméstica, Lugo, and Rivera move for severance, requesting that they "be tried separately from [Carmona, Serrano,

Criminal No. 16-547 (FAB)                                              27

Rivera, and Burgos]."   (Docket Nos. 522, 523 and 547.)    They

contend that prejudice resulting from "spillover evidence"

requires the Court to hold separate trials.   Id.

### F.   Federal Rule of Criminal Procedure 14

"As a rule, persons who are indicted together should be

tried together."   United States v. O'Bryant, 998 F.2d 21, 25 (1st

Cir. 1993).[6]   Joint trials prevent inconsistent verdicts and

conserve judicial resources.   Id.; Zafiro v. United States, 506

U.S. 534, 537 (1993) (noting that joint trials "promote efficiency

and serve the interest of justice by avoiding the scandal and

inequality of inconsistent verdicts.").   This preference "is

especially strong for coconspirators who are indicted together."

United States v. Jett, 908 F.3d 252, 276 (7th Cir. 2018); see

United States v. Colón-Miranda, 985 F. Supp. 36, 39 (D.P.R. 1997)

(Fusté, J.).

The Court may, however, sever the trial of a defendant

if "joinder [. . .] appears to prejudice" the United States or

the defendant. Fed. R. Crim. P. 14(a). Severance is a preemptive

measure, intended to reduce the "serious risk that a joint trial

---

[6] Rule 8(b) of the Federal Rules of Criminal Procedure provides: "The indictment
or information may charge 2 or more defendants if they are alleged to have
participated in the same act or transaction, or in the same series of acts or
transactions, constituting an offense or offenses.   The defendants may be
charged in one or more counts together or separately.   All defendants need not
be charged in each count." Fed. R. Crim. P. 8(b).

[will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 638.

To prevail, Rivera, Lugo and Alméstica and "must prove prejudice so pervasive that a miscarriage of justice looms." Id. (quoting United States v. Pierro, 32 F.3d 661, 615 (1st Cir. 1994)); United States v. Tejada, 481 F.3d 44, 55 (1st Cir. 2007) ("Prejudice means more than just a better chance of acquittal at a separate trial.") (quotation omitted).  The Rule 14 standard places a "heavy burden" on Rivera, Lugo and Alméstica.  United States v. Maravilla, 907 F.2d 216, 228 (1st Cir. 1990); United States v. Guitiérrez-Rodríguez, 480 F. Supp. 3d 380, 383 (D.P.R. 2020) ("A request for severance based on spillover prejudice requires a defendant to overcome a high threshold.") (Besosa, J.).

Courts possess "considerable latitude" regarding severance motions, and "will be overturned only if that wide discretion is plainly abused."  United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993) (citation omitted).  "[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Zafiro, 506 U.S. at 539; see United States v. Baltas, 236 F.3d 27, 34 (1st Cir. 2001) (holding that a limiting instruction provides an adequate safeguard against evidentiary spillover prejudice).

### 1.   Spillover Evidence

In joint trials, the risk of "'spillover' may arise where evidence that is not admissible or should not be considered against one defendant on his or her own is admitted against a co-defendant." United States v. Cancel-Lorenzana, 28 F. Supp. 3d 138, 140 (D.P.R. 2014) (Besosa, J.); United States v. Gilbert, 92 F. Supp. 2d 1, 10 (D. Mass. 2000) ("Severance is appropriate when the evidence that would be presented at one trial would be inadmissible at a second trial.") (citing United States v. Diallo, 29 F.3d 23, 28 (1st Cir. 1994)).   Pursuant to Federal Rule of Criminal Procedure 14(a) ("Rule 14"), prejudice resulting from spillover evidence may require the commencement of separate trials.   See, e.g., United States v. Mardian, 546 F.2d 973 (D.C. Cir. 1976) (overturning the conviction of a defendant who had been tried jointly with three principal members of the Watergate conspiracy, all of whom played much more substantial roles in the crime over longer periods of time); United States v. Kelly, 349 F.2d 720, 759 (2nd Cir. 1965) (holding that the district court erred in failing to sever the trial of three co-defendants, only two of whom "must have stamped in the eyes of the jurors as unscrupulous swindlers of the first rank").

Spillover evidence also refers to the "threat" that defendants "charged with only a minor role" will be "assess[ed]" according to the "extensive" evidence against other defendants. United States v. De La Paz-Rentas, 613 F.3d 18, 23 (1st Cir. 2010). "Because of the natural tendency to infer guilt by association, a defendant may suffer by being joined with another allegedly 'bad man.'" King v. United States, 355 F.2d 700, 704 (1st Cir. 1966). Severance need not occur, however, "[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others." United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990). That codefendant may be "unattractive to the jury" is generally not sufficient to warrant severance. 1A Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 225 (5th ed. 2020); United States v. DeCologero, 530 F.3d 36, 53 (1st Cir. 2008) (holding that the "unsavoriness of one's codefendant (including past criminal conduct) is not enough, by itself, to mandate severance").

G.    **Pretrial Publicity**

Alméstica and Lugo argue that "excessive media coverage" has contaminated the jury pool. (Docket Nos. 522 at p. 6; Docket No. 523.) They cite twenty-three news articles detailing the allegations in count five, asserting that "the public, who are

potential jurors, believe that this trial is the trial of Maurice Spagnoletti's murder and that everyone charged is involved and responsible for his death."  Id. at p. 7.

Jurors will often be aware of high-profile cases.  As the Supreme Court of the United States explained long ago:

> In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.

Reynolds v. United States, 98 U.S. 145, 155-56 (1878).  Criminal cases in particular may arouse the interest of the public.  Irvin, 366 U.S. at 722-23.  "It is no surprise that people in general, and especially the well-informed, will be aware of [a high-profile case]."  In re Tsarnaev, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam).  Comprehensive inquiry during voir dire will screen for bias arising from pretrial publicity.  See United States v. Wilson, 715 F.2d 1164, 1174 (1st Cir. 1983) ("[A]ny potential prejudice from the extensive pretrial publicity . . . was avoided by the trial court's voir dire of the jury"); United States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984) ("[We] find no abuse of discretion in the conduct of the voir dire or the refusal to grant a severance or change of venue based on the pretrial publicity"); Skilling v. United States, 561 U.S. 358, 398-99 (2010) (noting

that jurors "need not enter the box with empty heads in order to determine the facts impartially.  It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.") (internal citation and quotation omitted).  Consequently, potential bias stemming from pretrial publicity is an insufficient basis for granting Rivera, Lugo and Alméstica's severance motions.

### H.    The Relevancy of Murder Evidence to Counts One and Two

According to the motions for severance, the jury will consider evidence pertaining to charged and uncharged murders in determining whether Alméstica and Lugo are guilty of counts one and two, and whether Rivera is guilty of counts one, two, and five.  (Docket Nos. 522 and 523.)  This evidence may, however, constitute direct proof that the defendants engaged in a drug-trafficking conspiracy.

The United States intends to "present [evidence of several murders] at trial that are intrinsic to the charges in the superseding indictment."  (Docket No. 703 at p. 1.)  This evidence will demonstrate that:

> **Count Three:** Carmona murdered William Castro-Vidot on December 30, 2002 "to avoid a war with other drug-trafficking organizations." Id. at p. 3; see Docket No. 673 at p. 6.

**Count Four:** Carmona murdered René Cruz-Cuadrado because he "was cooperating with rivals." Id.; see Docket No. 674 at p. 8.

**Count Five:** Carmona, Serrano, Rivera, and Burgos murdered Maurice Spagnoletti because he "intended to cancel a lucrative-maintenance contract in the Doral Bank which had been awarded to a company owned by Rivera." Id. at p. 4; see Docket No. 674 at p. 11.

**Uncharged Murder One:** Carmona and Alméstica murdered Carlos Ríos-Cardona "because he was selling drugs on the side and not providing any of the profits to the enterprise." Id.

**Uncharged Murder Two:** Carmona and Serrano murdered Ángel Benítez-Sánchez "because he was perceived as a threat to the enterprise." Id.

**Uncharged Murder Three:** Rivera, Burgos, and Serrano murdered Luis De La Cruz-Martínez because he "prevailed in a lawsuit over Rivera." Id. at p. 4.

The United States maintains that this evidence is admissible "**as to all the** defendants to prove that they were members of the same enterprise and that the enterprise engaged in murder – elements for the offenses charged in Counts Three, Four, and Five." (Docket No. 703 at p. 10) (emphasis added). **Not all defendants, however, are charged in the section 924(j) counts.** The existence of an enterprise is irrelevant to the counts alleging a drug-trafficking conspiracy and the possession of a firearm in furtherance of that conspiracy. Simply referring to Alméstica and Lugo as uncharged members of an enterprise in the VICAR counts does not relieve the United States from establishing why this evidence is relevant to

counts one and two.  Rivera argues that the murders of William
Castro-Vidot and René Cruz-Cuadrado "have absolutely nothing to
do with [him], but which will nonetheless prejudice him with guilt
by association."  (Docket No. 547 at p. 5.)

        The United States argues in a perfunctory manner that
this evidence "shows both the existence of the conspiracy in Count
One and the means the defendants used to achieve the conspiracy's
goals." Id. at p. 11.  Murder evidence may, in fact, be admissible
as direct evidence of the drug-trafficking conspiracy. See United
States v. Ofray-Campos, 534 F.3d 1, 35 (1st Cir. 2008)
("[E}vidence that López-Soto murdered the leader of a rival drug
gang is just direct proof of the means used to carry out the
conspiracy"); United States v. Pérez-Cubertier, 958 F.3d 81, 87
(1st Cir. 2020) (affirming the admission of evidence related to a
murder committed by a co-conspirator in a drug-trafficking
conspiracy case); United States v. Rodríguez-Reyes, 714 F.3d 1,
17 (1st Cir. 2013) (affirming the denial of a motion to sever
because the evidence "established that [the defendant] was a
leader in the drug-conspiracy and that all seven murders were
committed in furtherance of that conspiracy.  The murder evidence
would have been admissible against [the defendant] even in a
separate trial").  But, the relevancy of the murder evidence in
this action is not apparent.  For instance, how is the murder of

Luis De La Cruz-Martínez relevant to the drug-trafficking conspiracy?  How is enacting revenge for prevailing in a civil suit material to count one?  WillAléstica and Lugo appear in court for days of testimony regarding a murder that is irrelevant to the crimes for which they stand trial?  See United States v. Martínez, 994 F.3d 1, 16, (1st Cir. 2021) (holding that a reasonable jury could find the defendant guilty, but vacating the conviction because "the government exposed López's jury to days of evidence of how other public officials in a complex alleged public corruption scheme in which López herself was not charged").  The Court cannot dispose of the motion to sever without additional information.  Accordingly, the United States is **ORDERED** to inform the Court and the defendants how each murder, whether charged or uncharged, is relevant to the drug-trafficking conspiracy.

## I. **The Motions to Exclude Evidence of Uncharged Murders and Cellular Phone Data**

Rivera, Serrano, Aléstica, and Lugo move to exclude evidence of uncharged murder evidence.  (Docket Nos. 624 and 750.)  Lugo also moves to exclude cellular phone data from trial.  (Docket No. 623.)  The United States purports that cellular site data from Lugo's phone places him "near the murder scene of Spagnoletti." (Docket No. 686 at p. 18.)

The motions to exclude uncharged murder evidence are contingent on the relevancy of the uncharged murders to counts one and two.  The Court will determine whether this evidence is admissible after the United States complies with the order set forth in the preceding section.  Accordingly, the motions to exclude uncharged murder evidence and Lugo's motion to exclude cellular phone data are **HELD IN ABEYANCE.**

**J.   Lugo's Motion to Exclude Evidence of Lawful Employment**

Lugo moves to preclude the United States from introducing evidence demonstrating that "he worked in 2 companies operated by codefendant [5] Rivera-Solís." (Docket No. 621 at p. 2.)  He avers that his employment "has nothing to do with the charges in the Indictment."  Id. at p. 3.

Federal Rule of Evidence 402 provides that all relevant evidence is admissible unless excluded by the United States Constitution, federal statute, or other rule.  Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence [and] the fact is of consequence in determining the action." Fed. R. Evid. 401.  The Court will assess whether this evidence is relevant within the context of trial.  Accordingly, Lugo's motion to exclude evidence of lawful employment is **DENIED WITHOUT PREJUDICE.**

He may raise an objection regarding the relevancy of this evidence at trial.

### K.   The Motion to Exclude Evidence of Religious Affiliation

Rivera, Lugo, Burgos and Alméstica are members of the Santería religion.  (Docket No. 548 at p. 1; Docket No. 620 at p. 2; Docket No. 622 at p. 2.)[7]  The fourth-superseding indictment states explicitly that:

> It was further part of the manner and means of the conspiracy that the leaders of the organization and their co-conspirators would practice the 'Santeria' religion to protect drug-trafficking activities. Commonly the leaders of the organization would identify themselves by wearing attire and amulets regularly used in the 'Santeria' religion . . . co-conspirators would seek advice from their religious leaders involved in the 'Santeria' religion to further their drug-trafficking activities . . . leaders and their co-conspirators would conduct 'Santeria' religious ceremonies or cults before engaging in significant criminal activities . . . co-conspirators would have to show reverence, obedience, and respect to those members of the organization that had a higher hierarchy within the 'Santeria' religion.

---

[7] Rivera, Lugo, and Alméstica filed separate motions *in limine*.  (Docket Nos. 548, 620 and 622.)  The Court's analysis is applicable to each motion.

Docket No. 673 at pp. 4-5.[8]   The United States produced "in discovery various notebooks and numerous pages from [Rivera's] Santeria books." (Docket No. 622 at p. 2.)  It also disclosed e-mail correspondence referring to Santería, pictures of Rivera's calendar with notations for religious holidays, and a forensic report "of human remains that [Rivera allegedly] had permission to obtain and which were used in religious rituals." (Docket No. 548 at p. 6.)[9]  They request that the Court preclude the United States from "presenting at trial any and all evidence related to Defendant's religion and religious practices." (Docket No. 620 at p. 2.)  Rivera, Lugo, Burgos, and Alméstica assert that this evidence is unduly prejudicial pursuant to Federal Rule of Evidence 403 ("Rule 403"). (Docket No. 548 at p. 7.)

---

[8]The Eleventh Circuit Court of Appeals has defined Santería as:

> a syncretistic religion of Caribbean origin in that it represents a compromise of conflicting religious beliefs. Its origins date back to the slave trade when African natives were forcibly transported to the Caribbean.  The religion is currently concentrated in Cuba and other Caribbean islands, among Hispanics in Florida, New York City, and Los Angeles. Ritual sacrifices form an integral part of many Santerían religious rituals.  Very little is known about the beliefs, rituals, symbolism, and practices of the Santerían religion.  Like most Aboriginal religions, it is preserved by an oral tradition.  There are priests and priestesses who are trained for many years in the oral tradition of the faith. This is followed by a period of solitude before being initiated. They learn dance, songs, and healing methods.  Their followers or clients are called "godchildren."

United States v. Díaz, 248 F.3d 1065, 1075 n.5 (11th Cir. 2001).

[9] The United States has informed the Court and the defendants that it "will not be introducing [evidence of the human remains] in [its] case in chief at trial." (Docket No. 556 at p. 8.)

**L.   Federal Rule of Evidence 403**

Federal Rule of Evidence 403 requires the exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403; see also Varoudakis, 233 F.3d at 122 (internal citations omitted). The First Circuit Court of Appeals has emphasized that Rule 403 protects "against **unfair** prejudice, not against all prejudice." United States v. Whitney, 524 F.3d 134, 141 (1st Cir. 2008) (emphasis added); see also United States v. Bauzó-Santiago, 51 F. Supp. 3d 198, 199 (D.P.R. 2014) (Besosa, J.) ("In balancing the scales of Rule 403, it is important to note that only unfair prejudice is to be avoided, as by design all evidence is meant to be prejudicial") (citation and internal quotation omitted). Pursuant to Rule 403, trial courts possess "considerable latitude in determining whether to admit or exclude evidence."   Santos v. Sunrise Medical, 351 F.3d 587, 592 (1st Cir. 2003) (internal citations omitted).   When the balance between the probative value and unfair prejudice of contested evidence is close, "Rule 403 tilts the balance in favor of admission."   Whitney, 524 F.3d at 141 (internal citations omitted).   Rule 403 governs the admission of evidence pertaining to religious affiliation. See United States

v. Beasley, F.3d 1518, 1627 (11th Cir. 1996) (denying the
defendant's motion *in limine* pursuant to Rule 403, holding that
the "evidence regarding [his] religion was relevant, because
religious teachings were used to justify, rationalize, and promote
crime"); Shannon v. United States, Case No. 18-15420, 2021 U.S.
Dist. LEXIS 239644, at *26 (D.N.J. Dec. 15, 2021) (holding that
photographs depicting Santería imagery were admissible because
they "show[ed] what was found during the [execution of a warrant]
. . . and clearly connected [the defendant] to this residence").

   **M.   Evidence of Religious Affiliation is Admissible**

         The United States asserverates that Santería "played an
important role in the [drug-trafficking conspiracy]."  (Docket
No. 556 at p. 3.)  As a high priest, Rivera purportedly influenced
officials   at   Doral   Bank   to   finance   the   drug-trafficking
conspiracy.  Id. at p. 4.  Carmona, Lugo, Aléstica, Serrano, and
Burgos received religious counsel from Rivera "in furtherance of
the conspiracy."  Id.  The defendants' religious practices are
relevant only to the extent that they prove the existence of a
material fact.  Here, the defendants' religious practices are
probative of their participation in a drug-trafficking conspiracy
and   the   existence   of   an   agreement   to   distribute   controlled
substances.  See United States v. Jiminez, 983 F.2d 1020, 1022
(11th Cir. 1993) (affirming the admission of "testimony concerning

the presence of a religious statute in [the defendant's] home and the role of the statue in the Santería religion"); Díaz, 248 F.3d at 1075 ("[The defendants] were Santeria priests and used their positions to gain confidential information regarding the financial status of their followers, called 'godchildren.'"); United States v. Reme, 738 F.2d 1156, 1164 (11th Cir. 1984) ("The trial court did not abuse its discretion in admitting evidence of the voodoo ceremony and the disappearances of Vixmar and Alliance," because this evidence proved that the defendants were "in control of the transporting scheme, a smuggler rather than a passenger"); United States v. Ancheta, Case No. 20-027, 2020 U.S. Dist. LEXIS 229511, at *13 (W.D.N.C. Dec. 7, 2020) ("Mejia's testimony that the defendant's expressed motive in committing the kidnapping was a pact he made with Santa Muerte was corroborated by . . . a tattoo of Santa Muerte on the defendant's leg and by photographs apparently showing the defendant receiving that tattoo shortly before the crime . . . Accordingly, this evidence was admitted for proper purposes, and the defendant did not suffer unfair prejudice"); United States v. Goxvon-Chagal, 885 F. Supp. 2d 1118, 1155 (D.N.M. 2012) (holding that a prayer card to Saint Norbert was admissible because it "show[ed] knowledge and intent."  This prayer card contained the following passage: "keep away evil, because you are the owner of jails and prisons, close their doors

to me so I will not go into them"); <u>United States v. Hoffman</u>, 806
F,2d 703, 708 (7th Cir. 1986) ("[E]vidence as to Hoffman's
religious affiliation established a possible motive for his
sending the letter which was probative of whether Hoffman intended
the letter to constitute a 'true threat.'"); <u>United States v.</u>
<u>Simmons</u>, 431 F. Supp. 2d 38, 56-67 (D.D.C. 2006) (admitting
testimony referring to the witness' religious conversion because
it "explain[ed] the witness' motive for cooperating with law
enforcement"); <u>United States v. Laverde-Gutiérrez</u>, 2008 U.S. App.
LEXIS 24863, at *2 (5th Cir. Nov. 26, 2008) (citing evidence that
the defendant "provided a confidential informant ("CI") with money
and instructed him to rent an apartment in Houston, Texas, that
would be used to store cocaine.  [A codefendant] told the CI that
a Santeria priest . . . would be staying with them at the apartment
to 'protect' the shipment of cocaine").

          The probative value of evidence relating to the
defendant's religious affiliation is significant.  The defendants
posit that this evidence will confuse the jury and appeal to bias
against the Santería religion.  (Docket No. 548 at p. 7; Docket
No. 620 at p. 5).  These assertions do not support the exclusion
of relevant evidence.  The Court may question a prospective
juror's opinions of Santería during *voir dire*, and will take
measures to ensure that the jury that is ultimately empaneled will

fulfill its oath to render a fair and impartial verdict.  See Box
v. Petsock, 697 F. Supp. 821, 830 (M.D. Pa. 1987) ("The mere fact
that petitioner was a member of a 'religious minority' does not
give rise to a presumption that jurors of different religious
affiliations would treat the petitioner differently than they
would treat any other defendant.").  The motion to exclude
evidence of religious affiliation is **DENIED**.

   **N.    Rivera and Alméstica's Motion to Exclude Evidence
           Pertaining to the 2009 Intervention in Texas**

           On October 6, 2009, Drug Enforcement Administration
("DEA") agents detained Rivera and Alméstica at an airport in
Brownsville, Texas.  (Docket No. 556 at p. 9.)  Rivera and
Alméstica were travelling to San Juan, Puerto Rico with $34,060
in United States currency.  Id.  The United States produced a DEA
report stating that:

> DFW/DEA Task Force received information from
> Confidential Source [name redacted] that ALMESTICA and
> RIVERA had purchased cash, round-trip tickets from San
> Juan to Brownsville, Texas via DFW Airport.  A background
> check produced a 2009 NADDDIS history from Puerto Rico
> alleging ALMESTICA was the owner of a crack house in
> Trujillo Alto, RIVERA was also located in NADDIS as being
> associated with cocaine trafficking in Puerto Rico.

Id.  The DEA agents interviewed Rivera and Alméstica separately.
Id.  Alméstica claimed that he traveled to Texas with Rivera to
purchase religious artifacts, but could not provide additional
details regarding this trip.  Id.  Initially, Rivera denied that

he knew Alméstica, "but then changed his story and admitted that he knew him." Id.  Rivera stated that Alméstica and he intended to purchase "old vehicles," but could not provide information regarding specific vendors. Id.  During the interviews, Rivera yelled "vehicles" to Alméstica, who was in an adjacent room. Id. Alméstica then "changed his story and told the officers that they were both traveling to purchase vehicles." Id. at pp. 9—10.  No charges were filed against the defendants. Id. at p. 10.  The United States did, however, seize the $34,060. Id.  According to Rivera and Alméstica, this evidence is inadmissible. (Docket No. 553.)

**O.   The Prior Bad Act-Intrinsic Evidence Dichotomy**

Rule 404(b) pertains to "other" bad acts that do not constitute direct evidence of a charged offense. See United States v. Mare, 668 F.3d 35, 39 (1st Cir. 2012).  Accordingly, evidence falls within the ambit of Rule 404(b) **only** if it is **extrinsically** relevant. See United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005) ("Rule 404(b), by its very terms, excludes only extrinsic evidence – evidence of other crimes, wrongs, or acts – whose probative value exclusively depends upon a forbidden inference of criminal propensity.  Evidence **intrinsic** to the crime for which defendant is on trial, accordingly, is not governed by Rule 404(b).") (citation and quotation omitted) (emphasis added);

United States v. Dorsey, 677 F.3d 944, (9th Cir. 2012) ("We agree with the district court that the testimony of [the witnesses] about seeing [the defendant] with a Glock or Glock-like gun . . . bore directly on the commission of the charged crime," thus, "it was inextricably intertwined with those crimes and outside the scope of 404(b).").

The terms "intrinsic" and "prior bad act evidence" are "loose labels," subject to a fact-specific inquiry. United States v. Randazzo, 80 F.3d 623, 630 (1st Cir. 1996). Prior bad acts are "reasonably distinct (*e.g.* in time and place) from the crime charged in the indictment." Id. By contrast, intrinsic evidence is "more closely entangled with the events that comprise the charged offense." Id. For instance, "[u]ncharged acts [that] illuminate the chronology of events leading to the acts charged in an indictment, or that inform the jury concerning the circumstances surrounding the commission of the charged crime" are generally admissible. 1 Weinstein's Evidence Manual § 7.01 (2021). The intrinsic evidence doctrine is applied "broadly" by the First Circuit Court of Appeals. Id. (citing United States v. Robles-Álvarez, 874 F.3d 46, 50-51 (1st Cir. 2017) (affirming the admission of intrinsic evidence to prove "how the various co-conspirators came together").

P.   **The 2009 Intervention is Admissible**

Rivera and Alméstica presume that the 2009 intervention in Texas is prior bad act evidence, extrinsic to the charged offenses.  (Docket No. at p. 3; Docket No. 553 at p. 2.)  It is not.  This intervention is direct evidence of the crimes charged in the fourth-superseding indictment, rendering Rule 404(b) inapplicable.  Count one alleges that the defendants entered into a drug-trafficking conspiracy for "financial gain and profit." (Docket No. 673 at p. 2.)  That Rivera and Alméstica possessed stacks of United States currency is probative of their intent to participate in a drug trafficking conspiracy.

The 2009 intervention occurred during the time of the alleged drug-trafficking conspiracy.  <u>See</u> Docket No. 673 at p. 1. The jury might interpret this evidence as an innocuous attempt to purchase religious artifacts, or to shop for used cars.  Or, the jury will reject this narrative, and find that Rivera and Alméstica possessed $34,060 in cash at an airport in Brownsville, Texas to engage in drug-trafficking.   <u>See</u> <u>United States v. Figueroa</u>, 976 F.2d 1446, 1454 (1st Cir. 1992) ("Evidence that the defendant possessed or controlled substantial sums of money from unexplained sources is relevant in the prosecution for drug trafficking.") (citing <u>United States v. Newton</u>, 891 F.2d 944, 948 (1st Cir. 1989) ("It is common ground that the possession of large

amounts of . . . cash in connection with evidence of narcotics trafficking in generally relevant and admissible.")); United States v. 6 Fox St., 480 F.3d 38, 41 (1st Cir. 2007) (noting that "drugs, drug ledgers and cash" are "strong evidence of drug-trafficking"); United States v. Bernal, 719 F.2d 1475, 1478 (9th Cir. 1983) (affirming the denial of the defendant motion to exclude "large amounts of unexplained cash").  At this juncture, the Court is unconvinced that the threat of unfair prejudice outweighs the probative value of the 2009 intervention. Consequently, Rivera and Alméstica'a motion *in limine* to exclude this evidence is **DENIED**.

> **Q.   Alméstica and Burgos' Motion to Exclude Evidence Pertaining to the 2007 Intervention in Puerto Rico**

On January 12, 2007, Puerto Rico Police Department ("PRPD") officers observed Alméstica and Burgos drive a white Suziki XL-7 at the San Patricio mall in Guaynabo, Puerto Rico. (Docket No. 662 at p. 2.)  The officers observed a .40 caliber Glock model 23 pistol and $4,184 in United States currency inside the Suziki XL-7.  Id.  The state authorities commenced a criminal action.  Id.  The Puerto Rico court dismissed this case, however, citing a lack of probable cause.  Id.

Alméstica and Burgos argue that the 2007 intervention is a prior bad act. (Docket No. 619.)  It is not.  The defendants

are charged with possessing a firearm in furtherance of a drug-trafficking crime.  (Docket No. 673 at p. 6.)  That Alméstica and Burgos possessed a .40 caliber Glock model 23 pistol is probative of an essential element of this allegation.  The 2007 intervention allegedly occurred within the temporal scope of the conspiracy. (Docket No. 673 at p. 6.)  For the reasons cited in Section VII of this Opinion and Order, evidence of the 2007 intervention is admissible.

Alméstica contends that "because no probable cause was found and the case was dismissed, we cannot say that a firearm was actually seized from Burgos-Amaro nor from Alméstica-Monge." (Docket No. 619 at p. 5.)  The probable cause disposition of a Puerto Rico court is irrelevant to the Court's analysis.  The Puerto Rico Court does not determine whether evidence is relevant or admissible in this jurisdiction.  The jury will assess whether Alméstica and Burgos "actually" possessed a firearm in violation of section 924(c).  Consequently, Alméstica and Burgos' motion in limine to exclude the 2007 intervention is **DENIED.**

### R. Alméstica's Motion to Exclude Evidence of a Prior Conviction

In 2018, Alméstica allegedly threatened his girlfriend with a knife at a Walmart in Florida. (Docket No. 662 at p. 2.)[10] Subsequently, he "fled from Florida to Puerto Rico." Id. The United States Marshals Service ("USMS") then located Alméstica in Trujillo Alto. Id. The officers seized a loaded and modified Glock pistol from his person. Id. at p. 3. They also recovered two high-capacity magazines, white flex cuffs (plastic handcuffs), 111 rounds of .40 caliber ammunition, 15 rounds of .9mm caliber ammunition, a Smith and Wesson knife, a SWAT baseball hat, and a membership card to a shooting range. Id. According to this card, Alméstica joined the shooting range in 2011 "despite never having a license to possess a firearm." Id. The officers arrested Alméstica. Id. During a post-arrest interview, Alméstica informed federal agents that:

> [He] became involved with Santeria in the early 2000s. He was introduced to [Rivera] through a friend. He had known [Carmona] for years from the gym as well as through their practice of Santeria at [Rivera's] house. And he admitted knowing [Burgos] since before going to [Rivera's] house. [He] stopped going to [Rivera's] house, though, because he saw some things related to Santeria that he did not like.

---

[10] The bad acts that Alméstica seeks to exclude occurred after the conspiracy. "Bad acts committed subsequent to the charged behavior are admissible under Rule 404(b) as long as they meet the criteria set forth in the Rule." United States v. Blanchard, 867 F.3d 1, 10 n.10. The Court will employ the term "prior bad acts" to avoid confusion.

(Docket No. 662 at p. 3.)

A grand jury returned an indictment on January 24, 2018, charging Alméstica with illegal possession of a machinegun in violation of 18 U.S.C. section 922(o).  (Case No. 18-020 (FAB), Docket No. 8.)  He entered a straight plea of guilty.  Id., Docket No. 21.  The Court imposed a sentence of imprisonment for a term of thirty-six months.  Id., Docket No. 43.  The First Circuit Court of Appeals affirmed this sentence.  Case No. 19-1945, Judgment (June 30, 2021).

The United States intends to elicit evidence of the 2018 arrest.  It does not, however, "plan to introduce evidence regarding the circumstances of the domestic abuse at trial." (Docket No. 662 at p. 2.)  Alméstica moves to exclude evidence regarding the 2018 arrest pursuant to Federal Rule of Evidence 404(b).  (Docket No. 618.)

**S.   Federal Rule of Evidence 404(b)**

Rule 404(b) prohibits the admission of prior bad acts to establish an individual's character or propensity to commit a crime.  Fed. R. Evid. 404(b).  The rule permits, however, the admission of prior bad acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011) (citing Fed. R. Evid.

404(b)); see United States v. Gilbert, 229 F.3d 15, 25 (1st Cir. 2000) (noting that "Rule 404(b) is a rule of inclusion").  The "other purposes" enumerated in Rule 404(b) are "illustrative, not exhaustive."  United States v. Rodríguez-Soler, 773 F.3d 289, 297 (1st Cir. 2014) (citation omitted) (affirming admission of 404(b) evidence demonstrating that the defendant "knew some of the conspirators, a non-propensity purpose").

        The proponent of Rule 404(b) evidence must satisfy a two-part test.  Landry, 631 F.3d at 602.  First, "the evidence must have 'special relevance' to an issue in the case such as intent or knowledge."  United States v. Varodakis, 233 F.3d 113, 118 (1st Cir. 2000) (internal citations omitted); see, e.g., United States v. Castro-Ward, 323 F. Supp. 3d 304, 306 (D.P.R. 2018) ("Evidence that Castro previously smuggled contraband into federal detention facilities demonstrates both that she knowingly possessed contraband, and intended to conceal cellular phones from BOP officials on July 30, 2016.") (Besosa, J.).  Courts consider the temporal proximity of the prior bad acts and the degree of similarity to crimes charged in the indictment.  United States v. Landrau-López, 444 F.3d 19, 23 (1st Cir. 2006).  Second, "under [Federal Rule of Evidence 403], evidence that is specially relevant may still be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice."
<u>Varodakis</u>, 233 F.3d at 119.

"In the Rule 404(b) context, evidence of similar acts
is relevant only if the jury can reasonably conclude that the act
occurred and that the defendant was the actor." <u>United States v.
DeCicco</u>, 370 F.3d 206, 211 (1st Cir. 2004) (citing <u>Huddleston v.
United States</u>, 485 U.S. 681, 689-90 (1998)).  The Court need only
find that the United States has presented sufficient
circumstantial evidence so that a jury could reasonably conclude
by a preponderance of evidence that the defendant committed the
prior bad act.  <u>Id.</u> at 212.  Ultimately, the admission of 404(b)
evidence is "committed to the sound discretion of the trial court"
and subject to an abuse of discretion standard of review.  <u>United
States v. Fields</u>, 871 F.2d 188, 196 (1st Cir. 1989)) (citation
omitted).

**T.   Evidence of Possession of the Firearm is Admissible**

The linchpin of Alméstica's motion *in limine* concerns
the special relevance prong of the 404(b) analysis.  Alméstica
sets forth two arguments. First, he maintains that the 2018 arrest
"has no special relevance in this case." (Docket No. 618 at p.
12.)  Second, Alméstica argues that this evidence will confuse
the jury.  <u>Id.</u>

To secure a conviction, the United States must "show the existence of a conspiracy, [Alméstica's] knowledge of the conspiracy, and [his] voluntary participation in the conspiracy." United States v. Monserrate-Valentín, 729 F.3d 31, 41 (1st Cir. 2013) (internal quotation and citation omitted).  Indeed, 404(b) evidence is "'specially relevant' when it tends to prove one or more of the elements of the crime of conspiracy."  United States v. Rodríguez, 215 F.3d 110, 119 (1st Cir. 2000).  Alméstica's possession of a firearm and ammunition in 2018 is relevant for a non-propensity purpose.  This evidence is probative of his intent and knowledge to possesses a firearm in furtherance of the drug-trafficking conspiracy.  It undermines Alméstica's assertion that "he was simply present when others committed crimes."  Docket No. 662 at p. 7; see United States v. Galíndez, 999 F.3d 60, 67 (1st Cir. 2021) ("That Rivera had the same or similar gun about a month before the facts giving rise to the federal indictment is specially relevant to the constructively-possessing-a-gun charge (independent of any taboo character inferences)."); United States v. Adams, 783 F.3d 1145, 1150 (8th Cir. 2015) ("[O]ur precedent indicates that previous firearm-related crimes can be relevant to prove that a defendant had the necessary knowledge that a firearm was present on or near his person and that a defendant had the intent to possess the firearm solely, jointly, or

constructively."). Moreover, the shooting range card suggest that he possessed a firearm in 2011, well within the scope of the alleged conspiracy.

The probative value of the prior conviction is not substantially outweighed by the threat of unfair prejudice. A limiting instruction mitigates the risk of any unfair prejudice, and will ensure that the jury consider this evidence as proof of Alméstica's intent to commit the firearm and drug-trafficking offenses. See United States v. Henry, 848 F.3d 1, 10 (1st Cir. 2017) ("[A]lthough the similarity between Henry's prior drug conviction and the charged drug crime presents a risk that the jury might draw an impermissible inference of propensity, the court addressed that risk with a limiting instruction."). Consequently, Alméstica's motion in limine to exclude evidence of the 2018 arrest is **DENIED.**

## XI.  Conclusion

For the reasons set forth above, Carmona's motion to dismiss the fourth-superseding indictment is **DENIED.**  (Docket No. 743.) Alméstica, Lugo, and Rivera's motions to disclose the identity of an alleged government informant are **DENIED.**  (Docket Nos. 519 and 539.)  Alméstica, Lugo, Rivera, and Serrano's motions to sever and exclude uncharged murder evidence are **HELD IN ABEYANCE.** (Docket Nos. 522, 523, 547, 624 and 750.)  Lugo's motion to exclude

cellular phone evidence is also **HELD IN ABEYANCE.**  (Docket No. 623.)  Lugo's motion to exclude evidence of lawful employment is **DENIED WITHOUT PREJUDICE.** (Docket No. 621.)  Alméstica, Lugo, Rivera, and Burgos' motion to exclude evidence of religious affiliation is **DENIED.**  (Docket Nos. 548, 620 and 622.) Alméstica and Rivera's motion to exclude evidence of the 2009 intervention in Texas is **DENIED.**  (Docket No. 553.)  Alméstica and Burgos' motion to exclude evidence of the 2007 intervention in Puerto Rico is **DENIED.**  (Docket No. 619).  Lastly, Alméstica's motion to exclude evidence of a prior conviction is **DENIED.**  (Docket No. 618.)

The United States is **ORDERED** to inform the Court and the defendants how each murder, whether charged or uncharged, is relevant to the drug-trafficking conspiracy **no later than May 6, 2022.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 25, 2022.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE