**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

     **Plaintiff,**

         **v.**

LUIS CARMONA-BERNACET [1],
YADIEL SERRANO-CANALES [2],
ALAN LUGO-MONTALVO [3],
ROLANDO RIVERA-SOLÍS [5], and
ALEX BURGOS-AMARO [6],

     **Defendants.**

**Criminal No.** 16-547 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

Before the Court are several pretrial motions. First, defendants Luis Carmona-Bernacet [1] ("Carmona"), Yadiel Serrano-Canales [2] ("Serrano"), Alan Lugo-Montalvo [3] ("Lugo"), Rolando Rivera-Solís [5] ("Rivera"), and Alex Burgos-Amaro [6] ("Burgos") (collectively, "defendants") all move the Court to dismiss count five of the fourth superseding indictment pursuant to Brady v. Maryland, 373 U.S. 83 (1963). (Docket Nos. 921, 922, 970 and 974.) Second, the United States moves to preclude the defendants from inquiring about the "absence of investigative tools like DNA testing, fingerprints, and other forensic technique[s] . . . unless it is tied to the weight afforded to specific physical evidence introduced at trial." (Docket No. 931 at p. 2.) For the reasons

set forth below, the defendants' motions to dismiss count five are **DENIED**. (Docket Nos. 921, 922, 970 and 974.) The United States' motion *in limine* is **DENIED WITHOUT PREJUDICE**. (Docket No. 931.)

## I.   Background

On June 29, 2021, a grand jury returned a five-count, fourth superseding indictment against defendants Carmona, Serrano, Lugo, Fabiany Alméstica-Monge, Rivera, and Burgos. (Docket No. 673.) The first two counts charge the defendants with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 860 (count one), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (count two). (Docket No. 673.) Counts three and four aver that Carmona murdered William Castro-Vidot ("Castro") and René Cruz-Cuadrado ("Cruz") in violation of the Violent Crimes in Aid of Racketeering Activity statute, 18 U.S.C. § 1959 ("VICAR"). Id. at pp. 6-10. The final fifth count alleges that Carmona, Serrano, Rivera, and Burgos murdered Maurice Spagnoletti ("Spagnoletti"), also in violation of VICAR. Id. at p. 12.

### A.   The 2013 Civil Litigation

The defendants charged in the fifth count allegedly murdered Spagnoletti on June 15, 2011. Id. at p. 12. Two years after his death, Marisa Spagnoletti ("Marisa"), L.S. ("L.S."), and

Spagnoletti's estate commenced a civil action against Doral Financial Corporation (the "firm"), Doral Bank Puerto Rico, Glen Wakeman ("Wakeman"), Enrique Ubarri-Baragaño ("Ubarri"), José Robles ("Robles"), and Annelise Figueroa ("Figueroa"). See Spagnoletti v. Doral Fin. Corp., Case No. 13-1470 (JAF), Docket No. 1. Marisa and L.S. are Spagnoletti's widow and daughter, respectively. Id. at pp. 1-2. Wakeman, Ubarri, Robles, and Figueroa are, respectively, the former chief executive officer, executive vice president, head of security, and executive vice president of facilities at Doral Financial Corporation (hereinafter, "civil defendants"). Id. at p. 2.

According to the complaint, Spagnoletti moved from New Jersey to San Juan, Puerto Rico in 2010 to serve as an executive at Doral Bank. Id. at p. 4. During this timeframe, the United States investigated the firm's lending practices and regulatory compliance. Id. at p. 5. Spagnoletti purportedly learned of "fraudulent or improper transactions involving Doral Financial and various third parties," including Ubarri and Figueroa. Id. For instance, Ubarri requested that Spagnoletti approve a loan for a friend to purchase a $1,000,0000 condominium in Isla Verde, Puerto Rico. Id. Spagnoletti personally inspected this property, however, observing that the current owner had destroyed the condominium and had even removed the kitchen appliances. Id. The

value of the condominium was approximately half the price listed on the loan application. Id. Moreover, Doral Financial Corporation dispersed $1,000,000 to another individual, accepting a hotel as collateral for the loan. Id. This hotel did not, however, even exist. Id.

Spagnoletti learned that "someone was wiring $30,000 per week from Doral Financial or Doral Bank to either Figueroa or an outside corporate entity for services that were not being rendered." Id. at p. 7. Figueroa authorized payment for new light fixtures and furniture that never arrived. Id. She approved the disbursement of several hundred thousand dollars to an architect for a "bank branch that was never built." Id. Wakeman's assistant and Robles had knowledge of these payments. Id. Ubarri opposed Spagnoletti's attempts to "involve outside counsel" and "disclose the problem." Id. at p. 5.

Undeterred, Spagnoletti "continually questioned the accounting practices of the firm, because he did not believe the reporting to be accurate." Id. Certain branches of Doral Bank offered "different rates to different customers." Id. Spagnoletti notified Wakeman, but the CEO could not explain these discrepancies. Id. In 2011, Wakeman informed Spagnoletti that the firm intended to "undergo restructuring," relocate to Florida, terminate Figueroa, and retain Spagnoletti as president. Id. Six

months after arriving in Puerto Rico, Spagnoletti earned a $250,000
raise, culminating in a base salary of $650,000.  Id. at p. 7.
This raise did not, however, undermine Spagnoletti's attempts to
address ongoing fraud and conflict within the firm.  Ubarri and
Spagnoletti argued regarding Figueroa's termination.  Id.  When
Spagnoletti returned to his office after this argument, he observed
a photo of Figueroa with an "X" over it posted on his office door.
Id. at p. 8.  Subsequently, "an explicit threat was made against
Spagnoletti's life."  Id.  Ubarri informed Spagnoletti that if
Figueroa were terminated, he would "regret it."  Id.

        The firm dismissed these threats, taking no precautions
to protect Spagnoletti from physical harm.  Id.  Indeed, the firm
assured Spagnoletti that "his life was not in danger."  Id. at
p. 9.  Wakeman perceived threats to his own safety, however,
retaining private chauffeurs and bodyguards.  Id.  Shortly before
his murder, "unidentified individuals" followed Spagnoletti,
Marisa, and L.S.  Id.  Spagnoletti was repeatedly shot and killed
shortly after these incidents.  Id.  Two days after the murder,
federal agents escorted Marisa to the Luis Muñoz Marín airport.
Id.  While at the airport, a person who identified himself as
purporting to be a Doral Bank employee approached Marisa.  Id. at
p. 10.  This employee "worked in security, and knew of a plan to
kill Spagnoletti, with which Robles was involved."  Id.

Marisa, L.S., and Spagnoletti's estate set forth eleven causes of action against the civil defendants pursuant to Puerto Rico and federal law.  Id. at pp. 10-27 (Laws P.R. Ann. tit 31, § 5141 (wrongful death, count one), 18 U.S.C. § 1962 (federal RICO, count nine)).  Because of the "ongoing criminal investigation related to the murder of [Spagnoletti]," Marisa and L.S. moved for voluntary dismissal of the civil action on January 13, 2014.  (Case No. 13-1470, Docket No. 74 at p. 1.)  The Court dismissed the civil action without prejudice on January 31, 2014.  (Case No. 13-1470, Docket No. 81.)

**B.   The Criminal Action**

This action originated more than a decade after Spagnoletti's murder.  (Docket No. 1.)  The Court has published four Opinions and Orders pertaining to discovery disputes, evidentiary matters, motions to dismiss, and requests for severance.  See United States v. Carmona-Bernacet, Case No. 16-547, 2022 U.S. Dist. LEXIS 75253 (D.P.R. Apr. 25, 2022) (denying the defendants' motion to dismiss, motion to disclose the identity of an alleged government informant, motion for severance, and motion to exclude evidence of religious affiliation) (Besosa, J.); United States v. Carmona-Bernacet, 539 F. Supp. 3d 253 (D.P.R. 2021) (denying the defendants' request for disclosure of Jencks Act material in advance of trial, motion to compel the United

States to produce a Report of Investigation, and motion to dismiss the third superseding indictment) (Besosa, J.); <u>United States v. Carmona-Bernacet</u>, Case No. 16-547, 2022 U.S. Dist. LEXIS 111447 (D.P.R. June 22, 2022) (denying the defendants' motion for severance, motion to exclude uncharged murder, and motion for an evidentiary hearing) (Besosa, J.); <u>United States v. Rivera-Solís</u>, Case No. 16-547 (D.P.R. Sept. 10, 2021) (*Ex Parte* Opinion and Order) (Besosa, J.).

Twenty days before the commencement of trial, the defendants moved to dismiss count five of the fourth superseding indictment. (Docket Nos. 921 at p. 9; Docket No. 922.)[1] According to the defendants, the United States withheld exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83. <u>Id.</u> This argument is compelling only in a vacuum and if the defendants suffered prejudice. Neither premise is true.

## II. Disclosure of Exculpatory Evidence

In <u>Brady v. Maryland</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates the due process where the evidence is material either to guilt or to punishment, irrespective of the

---

[1] Rivera and Burgos filed separate motions to dismiss. (Docket Nos. 921 and 922.) Serrano, Lugo and Carmona subsequently moved to join Rivera's motion to dismiss. (Docket No. 926, 972 and 974.) Because the defendants set forth duplicative arguments, the Court consolidates the motions to dismiss.

good faith or bad faith of the prosecution." 373 U.S. at 87.
Evidence "within its possession" includes exculpatory material
belonging to any agency that participated in investigations
related to the crimes charged.  See Kyles v. Whitley, 514 U.S.
419, 438 (1995) (Brady requires production of evidence "known only
to the police investigators and not to the prosecutors").

     To prevail on a Brady claim, the defendants must establish
that:  (1) exculpatory or impeaching material is "favorable to the
accused," (2) the evidence is "either willfully or inadvertently
suppressed by the government," and (3) "prejudice must have
ensued."  United States v. Alverio-Meléndez, 640 F.3d 412, 424
(1st Cir. 2011).  Evidence is material if, "had the evidence been
disclosed, the result of the proceeding would have been different."
United States v. Spencer, 873 F.3d 1, 6 (1st Cir. 2017) (quoting
Turner v. United States, 137 S. Ct. 1885, 1893 (2017) ("A
reasonable probability of a different result is one in which the
suppressed evidence undermines confidence in the outcome of the
trial.")).  Inadmissible evidence that "could . . . lead to strong
exculpatory evidence" falls within the ambit of Brady.  Ellsworth
v. Warden, N.H. State Prison, 333 F.3d 1, 5 (1st Cir. 2003)

     When the materiality of evidence is ambiguous, the United
States "should err on the side of [disclosure]."  United States v.
Urciuoli, 470 F. Supp. 2d 109, 113 (D.R.I. 2007) (citation

omitted).  Defendants do not, however, have the "unsupervised right to search through the [United States'] files."  Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987).  Dismissal of an indictment for a Brady violation is an "extreme measure."  Id. (citing cases).

The defendants contend that the United States violated Brady by failing to disclose exculpatory evidence in a timely manner. Docket No. 921 at 2; see United States v. De La Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015) ("Brady also applies in cases where the Government delays disclosure of relevant evidence."); United States v. Sepúlveda, 15 F.3d 1161, 1178 (1st Cir. 1993) ("Prosecutors have an obligation to furnish exculpatory and impeachment information to the defense in a timely fashion."). The deadline to disclose Brady material is, however, amorphous. Brady is triggered when "the delay prevent[s] defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case."  United States v. Van Anh, 523 F.3d 43, 51 (1st Cir. 2008) (citation omitted).  The dispositive inquiry is "whether the tardiness prevented defense counsel from employing the material to good effect."  United States v. Osorio, 929 F.2d 753, 757 (1st Cir. 1991) (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990) (holding that "a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous

disclosure, a more effective strategy would likely have resulted")).  Essentially, the defendants must set forth a "*prima facie* showing of a plausible strategic option which the delay foreclosed."  De La Cruz-Feliciano, 786 F.3d at 87 (citation omitted)

## III. Discussion

The United States provided 82 FBI 302s (i.e., FBI reports) to the defendants 47 days before the date the trial was to commence. (Docket No. 921 at p. 9; Docket No. 970 at p. 2.)  The defendants argue that these reports contain exculpatory and impeaching evidence.  Many of the allegations set forth in the reports are, however, are contained in the civil complaint from 2013.  These reports suggest that Spagnoletti's efforts to expose and remedy fraudulent activity threatened certain individuals and jeopardized lucrative misappropriation.  The defendants maintain that the following allegations are recent revelations, but a cursory review of the civil complaint belies this assertion.

**[Continue on the Next Page]**

| Alleged Brady Material<br>FBI 302 Reports<br>(Docket No. 921) | 2013 Civil Complaint<br><u>Spagnoletti v. Doral Fin. Corp.</u>,<br>Case No. 13-1470 (JAF), Docket<br>No. 1 |
|---|---|
| **Spagnoletti Received Threats from Firm Executives** | |
| "Maurice received a death threat from Enrique Ubarri." <u>Id.</u> at p. 4.<br><br>Spagnoletti was "afraid of what [Figueroa] might do once she quit receiving the money she was used to." <u>Id.</u><br><br>Ubarri told Wakeman and Spagnoletti that "if you fire [Figueroa], one of you is gonna [sic] die." <u>Id.</u> | "About three weeks prior to June 15, 2011 . . . an argument ensued involving [Ubarri] and Spagnoletti, in which [Ubarri] insisted that Figueroa be retained . . . After the argument, upon information and belief, Spagnoletti returned to his office and found a picture of Figueroa with an 'X' on it posted on his office door, which appeared to be a threat against Spagnoletti, who supported the termination of Figueroa. After the incident, with Figueroa's picture, upon information and belief, an explicit threat was made against Spagnoletti's life . . . [The] night the threat was received, [Ubarri] told Spagnoletti that if Figueroa was terminated, Spagnoletti would 'regret it.'" <u>Id.</u> at pp. 7-8. |
| **Spagnoletti Discovers Fraudulent Activity at the Firm** | |
| Executives at Doral Bank "[approved] contracts for companies that did not exist and were opening branches that did not exist, with the intent to defraud the bank . . . [Spagnoletti] believed that [Ubarri] was aware of and/or involved in some of the fraud happening at the bank." <u>Id.</u> at p. 5. | "[Ubarri] asked Spagnoletti to approve loans to two of [Ubarri's] friends for the purchase of a condominium in Isla Verde for approximately $900,0000-$1,000,000. Upon information and belief, Spagnoletti personally went to visit the subject condo, and found it had been destroyed by the current owner. Even the kitchen appliances had been removed from the unit. |

| | |
|---|---|
| Spagnoletti told "Individual 1 that he had uncovered fake billings . . . [Spagnoletti] uncovered a fraud where Ubarri was giving away properties to his friends and the transactions were not reflected on the books." Id. | Spagnoletti estimated that in its actual condition, the condominium could be worth no more than $500,000 to $600,000." Id. at p. 5. |
| Spagnoletti "identified 10 to 15 properties that were sold to only two or three different individuals at very low prices. The properties were valued at around $100,000 but were sold as low as $5,000." Id. Figueroa "signed off on the sales documents approving the transactions." Id. | "Doral Financial made a $1,000,000 loan to a woman who claimed to own a hotel as collateral for the loan, which turned out not to exist. The woman was not paying the loan, and Spagnoletti was endeavoring to involve outside counsel and deal with the loan pursuant to applicable bank regulations. Upon information and belief, [Ubarri] opposed Spagnoletti's attempts to disclose the problem." Id. |
| Spagnoletti "found a loan for property for about $1 million that made him suspicious. When Spagnoletti went to take a look at the property, he found that nothing was at the location." Id. at p. 6. | Spagnoletti "discovered that Figueroa had authorized the payment of invoices for the installation of new light fixtures, lighting, and furniture that were to be placed in the Doral Financial offices where [he] worked, when none of these items were ever installed." Id. at p. 7. |
| Spagnoletti discovered an issue "regarding a lighting contract." Id. | |
| Spagnoletti "believed that [Figueroa] was embezzling money from the bank." Id. at p. 7. | |

**Firm Executives Request or Imply that Spagnoletti Should Disregard Fraudulent Activity**

| | |
|---|---|
| Wakeman told Spagnoletti: "I need you to stop [the work you are doing]." Id. at p. 4. | The "federal government was performing an investigation of Doral Financial, which involved examination of Doral Financial's lending practices and regulatory compliance." Id. at p. 5. |
| Wakeman told Spagnoletti: "I need you to stop . . . I don't need you to make a lot of money, I need you to make just enough money." Id. | "In May 2011, upon information and belief, Spagnoletti continually questioned the accounting |

| | |
|---|---|
| Wakeman had a "hidden agenda with the bank," he obstructed an audit by the [Federal Deposit Insurance Corporation ("FDIC")], and instructed subordinates to "be slow and delay responses to the FDIC." _Id._ at p. He was "angry about information Spagnoletti was giving to the FDIC during the audit. Specifically, Spagnoletti had found commercial loans for properties sitting on the books of Doral PR at a loan origination value." _Id._ at pp. 5-6. Wakeman said that "the FDIC is not our friend." _Id._ at p. 6. | practices of the firm, as he did not believe the reporting to be accurate." _Id._ at p. 6.<br><br>"Spagnoletti raised these issues repeatedly with Wakeman and was increasingly concerned because [Wakeman] would not answer Spagnoletti's inquiries." _Id._<br><br>"Spagnoletti sought to hire a certified public accountant to address the problems, but upon information and belief, Wakeman was either unresponsive or denied the requests." _Id._ |
| Ubarri was "not helping [Spagnoletti] obtain the necessary information to investigate frauds and contracts at the bank." _Id._ at p. 7. | "In the days leading up to Figueroa's termination, upon information and belief, [Ubarri] repeatedly told Spagnoletti that Spagnoletti had to stop with the termination and stop his efforts to identify and address improprieties at Doral Financial and Doral Bank because he was trying to fix [these entities] too quickly." _Id._ at p. 8. |

The United States need not disclose "information that already is known to the defendant and its failure to do so cannot be deemed prejudicial." _Urciuoli_, 470 F. Supp. 2d at 115 (citing _United States Di Giovanni_, 544 F.2d 642, 645 (2d Cir. 1976) ("The government is not required to make a witness' statement known to the defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony he might furnish.")); see _United States v._

Pandozzi, 878 F.2d 1526, 1529 (1st Cir. 1989) ("Brady does not require the government to turn over information which, with any reasonable due diligence, the defendant can obtain himself."); United States v. DeColgogero, Case No. 01-10373, 2013 U.S. Dist. LEXIS 97476, at *19 (D. Mass. July 11, 2013) (denying a *habeas* petition based on an alleged Brady violation, noting that this "is not a case in which the FBI reports could have opened a whole new field of investigation that [the defendant] never considered. Whatever further evidence there might have been about [the defendant, he] did not need the FBI reports to find it") (citation omitted); United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001) ("The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels.") (citation omitted); United States v. Prior, 546 F.2d 1254, 1259 (5th Cir. 1977) (holding that "numerous cases have ruled that the government is not obligated under Brady to furnish a defendant with information which he already has or, with any reasonable due diligence, he can obtain himself").

The "recently discovered" evidence pertaining to fraud at the firm, threats to Spagnoletti's life, and hostility toward the FDIC investigation has existed in the public domain since at least June 6, 2013, when Marisa, L.S. and Spagnoletti's estate filed the civil complaint.  Docket No. 921 at p. 8; see Case No. 14-1470,

Docket No. 1; <u>United States v. Rodríguez</u>, 162 F.3d 135, 147 (1st Cir. 1998) (holding that the "government has no <u>Brady</u> burden when the necessary facts for impeachment are readily available to the diligent defendant, as they were here").   Indeed, the civil litigation predates the indictment by three years.   <u>Id.</u>; Docket No. 1.   With due diligence, defense counsel could have reviewed the civil complaint simply by accessing the electronic case file. The defendants have had six years to investigate Spagnoletti's tenure at Doral Financial Corporation.   No impediment is preventing the defendants from incorporating this information into their respective trial strategies.   Accordingly, the defendants' <u>Brady</u> argument regarding evidence set forth in the FBI reports and civil complaint is unavailing.

The Court recognizes that the following information is referred to in the FBI reports, but not the civil complaint:

1.   An inmate informed the FBI that "the former owner of the bank, Salomon Levis, had met with him and said that they need to kill a banker."   (Docket No. 921 at p. 6.)

2.   An inmate "had murdered Spagnoletti erroneously, thinking that he was a drug-point enemy."   <u>Id.</u>

3.   An inmate was "paid $200,000 to kill the banker." <u>Id.</u>

4.   Spagnoletti "express[ed] fear of [Figueroa]," but "seemed to be more focused on the Yemit investigation."   <u>Id.</u> at p. 7.

5. Spagnoletti "[completed] the Yemit investigation and concluded that Yemit billed for services not rendered." Id.

6. According to a "former high-ranking and respected federal law enforcement officer, two executives at Doral had hired French mercenaries to murder Spagnoletti." Id.

The Court need not consider whether this information is exculpatory pursuant to Brady because it granted the defendants' request for a continuance, affording them ample time to investigate, and seek to make use of these jailhouse statements. Docket No. 948; See Szeliga v. Gen. Motors Corp., 728 F.2d 566, 568 (1st Cir. 1984) (holding that "the remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for continuance at the time the surprise occurs"); see, e.g., United States v. Watson, 76 F.3d 4, 8 (1st Cir. 1996) ("Watson's Brady violation is misplaced because the evidence was disclosed before trial and there was no demonstrable prejudice from the delay in the disclosure."); cf United States v. Mathur, 624 F.3d 498, 506 (1st Cir. 2010) ("The customary remedy for a Brady violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses.").

Trial is scheduled to commence on March 13, 2023. (Docket No. 953.) The defendants have four months in addition to the time

they have already had to explore "several 'motives' for the murder
of Maurice Spagnoletti." Docket No. 922 at p. 5; see United States
v. Houghton, 554 F.2d 1219, 1224 (1st Cir. 1977) (holding that the
defendant failed to establish that the United States committed a
Brady violation in part because defense counsel had "eight full
days prior to trial" to interview a government informant); United
States v. Walters, 351 F.3d 159, 169 (5th Cir. 2003) (holding that
the defendant failed to satisfy the prejudice prong of the Brady
analysis because "[he] had almost a month after the government
disclosed the [exculpatory information] to investigate and put it
to 'effective use' at trial"). Because the defendants have
suffered no prejudice, dismissal of count five is inappropriate.
Consequently, the motion to dismiss count five is **DENIED**. (Docket
Nos. 921, 922, 970, and 974.)

The defendants surmise that the United States has not yet
disclosed certain Brady material. (Docket No. 970 at p. 9.) For
instance, they speculate that FBI reports from the night of
Spagnoletti's murder are pending disclosure. Id. Accordingly,
they request that the Court order the United States to produce all
Brady material within the next five days or forgo admission of
this evidence at trial. Id. at p. 10. This Court possesses the
authority to order the pretrial disclosure of Brady material.
United States v. Starusko, 729 F.2d 256, 261 (3d Cir. 1984)

(holding that the "district court may dictate by court order when Brady material must be disclosed"); see, e.g., D. Mass. Local R. 116.1-2 (instructing the United States to disclose Brady material "within 28 days of the arraignment" or "by any alternative date established by the court").  Setting a deadline to produce Brady material in this complex and prolonged litigation will protect the defendants' Sixth Amendment rights and prevent eleventh-hour discovery disputes.  Accordingly, the Court ORDERS the United States to disclose all Brady material **no later than March 1, 2023**. Failure to comply with this order may result in exclusion of this evidence at trial.

## IV. Inadequate Investigation Evidence

The United States moves to preclude the defendants from "posing questions regarding the absence of investigative tools like DNA testing, fingerprints, and any other forensic technique not used in the investigation unless it is tied to the weight afforded to specific physical evidence introduced at trial." (Docket No. 931 at p. 5.)  This motion requires the Court to assess the relevance of certain investigative tools in relation to evidence adduced at trial.

"Merely showing that an investigation is sloppy does not establish relevance."  United States v. Patrick, 248 F.3d 11, 22 (1st Cir. 2001) (holding that the district court did not abuse its

discretion by excluding evidence "that the police failed to take steps to adequately eliminate other possible suspects" because "[such] speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [the defendant] to accusations against the police"). The efficacy of a criminal investigation may, however, "sometimes be relevant to the ultimate issue of guilt in a case." See United States v. Carmichael, 373 F. Supp. 1293, 1296 (M.D. Ala. 2005) (citing Lowenfield v. Phelps, 817 F.2d 285, 291-92 (5th Cir. 1987) (holding that defense counsel acted reasonably by introducing evidence of "sloppy police work" to undermine the chain of custody and "set the stage for an argument that others were implicated in the murders")). The Court is cognizant that this evidence may be irrelevant and confuse the jury. See United States v. McVeigh, 153 F.3d 1166, 1192 (10th Cir. 1998) ("Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation.").

Federal Rule of Evidence 402 provides that all relevant evidence is admissible unless excluded by the United States Constitution, federal statute, or other rule. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more

or less probable than it would be without the evidence [and] the fact is of consequence in determining the action." Fed. R. Evid. 401. For example, Lugo anticipates that the United States will introduce cellular phones "to forcibly link him to Spagnoletti's alleged murder and the conspiracy." (Docket No. 974 at p. 3.) According to Lugo, the United States seeks to "limit his defense strategy, so that he may not cross-examine . . . regarding scientific and technological methods." Id. at p. 3. He misconstrues the motion *in limine*. The United States explicitly excluded investigative techniques regarding "specific physical evidence" from the motion to exclude "questions regarding the absence of investigative tools." (Docket No. 931 at p. 5.) The Court will assess whether this evidence is relevant and subject to cross-examination within the context of trial. Moreover, the parties may propose a limiting instruction regarding the use or absence of investigative techniques at the charging conference. See, e.g., United States v. Lassend, 545 F. App'x 3, 5 (1st Cir. 2013) (holding that the district court did not err by instructing the jury that "it could draw reasonable inferences from the fact that certain tests were inconclusive or not conducted, or that certain techniques were not used, as well as that law enforcement is not legally required to use any specific or all possible tests or techniques in order to prove its case").

## V.   Conclusion

For the reasons set forth above, Carmona's, Serrano's, Lugo's, Rivera's and Burgos' motions to dismiss count five of the fourth superseding indictment are **DENIED.**  (Docket Nos. 921, 922, 970 and 974.)   The United States' motion *in limine* is **DENIED WITHOUT PREJUDICE.**  (Docket No. 931.)  **Trial is set for March 13, 2023, at 9:00 a.m.** in Courtroom 5 in the Old San Juan Courthouse. (Docket No. 953.)  This date is firm, and no continuance will be granted.  **There will be a final pretrial conference on February 27, 2023 at 9:00 a.m.** in Courtroom 6 in the Old San Juan Courthouse. Id.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 13, 2022.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE